IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | |
| RAYTOSHA ELLIOTT | ) | 1:14-CR-0012-01-AT-JFK |
| | ) | (Second Superseding) |
| _____ | ) | |

SENTENCING MEMORANDUM AND REQUEST FOR
REASONABLE SENTENCE

COMES NOW the Defendant, RAYTOSHA ELLIOTT, by and through undersigned counsel, and hereby files this Sentencing Memorandum and Request for Reasonable Sentence. Ms. Elliott's sentencing is scheduled for **Monday, September 14th, at 10:30 a.m.** In this filing, the Defense will address Ms. Elliott's upbringing, military service, education, employment and volunteer work. The Defense will then address legal arguments supporting its request for a downward variance.

FACTUAL BACKGROUND

A.     Upbringing

Ms. Elliott grew up in Buckinham, Virginia. Her father was a band leader, who later became a prison counselor. Her mother is a retired nurse. Her oldest brother, A.H., is a maternal half brother that suffers from multiple health issues. He is also legally blind. Her second brother, R.E., had discipline and drug problems as he was

growing up.  Here is a photo of Ms. Elliott and her brothers as children:



Ms. Elliott and her brother R.E. were raised by both parents in a loving home. When she was young, Ms. Elliott's parents had their hands full dealing with the issues related to R.E.  As a result, Ms. Elliott became very independent at a young age.  She did well in school, she was active in sports.  While in junior high she played the flute.  All four years of high school she played the clarinet with her high school marching band. She was a tennis player in high school and more importantly, she joined ROTC.  Attached as Exhibit 1 is a letter from Major James D. Morley, who was Ms. Elliott's Senior Army Instructor for Buckingham County High School from 1995 to 1998.  He notes how Ms. Elliott, as a high school student, progressed from a Cadet to Cadet Lieutenant Colonel, the Knight Battalion Commander.  He also discusses a variety of volunteer work done by Ms. Elliott while she was in high

2

school.

B.   <u>Military Service</u>

Ms. Elliott graduated high school on June 11, 1998.  On June 25, 1998, she enlisted in the United States Army.  Because of her years with ROTC, she came in with a rank of Private First Class (E3).  During her years in the military she was stationed at several bases in the United States as well as in Germany.  Attached as Exhibit 2 are letters from Kevin Toon and Erica Steed, who  served with Ms. Elliott in Germany.  Sgt. Toon notes Ms. Elliott's quality of work and willingness to work extra hours to timely and proficiently complete a project.  He also notes how she would mentor younger soldiers and take them under her wing.  Ms. Steed, in her letter, discusses an incident when their unit was activated to deploy in support of the Kosovo Armed Conflict.  Ms. Elliott volunteered for the mission, offering to take the place of a soldier that had just learned she was pregnant.  Ms. Elliott ended up not going, but only because her father passed away unexpectedly.

Attached is a picture of Ms. Elliott with some of her fellow soldiers.  Ms. Elliott is kneeling on the front row, wearing glasses.



Ms. Elliott did well while she was in the Army. Her duties included field work, such as building fox holes, setting up tents and camp kitchens and setting up fuel berms. Her duties also included fuel testing and transporting - operating petroleum distribution systems and multi product pipeline systems. She learned how to drive a tanker as part of her duties. Most challenging for her was the "air assault school." This course required Ms. Elliott to jump out of a helicopter and propel down a rope starting at a height of 90 feet. She tried the exercise five different times, but she was not able to successfully complete it. The multiple tries led to stress fractures of the shins on both her legs. As a result of her injuries, Ms. Elliott left the Army. She received an honorable discharge on September 14, 2001, having achieved the rank of Specialist (E4) at the time of separation. During her military service, she received a number of commendations and honors, including a good conduct medal, army service ribbon, overseas service ribbon and a driver and a mechanic badge. PSR ¶ 72.

4

C.    Education

After her honorable discharge from the Army, Ms. Elliott went on to college. She graduated from Herzing University in Atlanta, Georgia in September of 2005 with a 3.36 GPA and a degree in information technology.  PSR ¶ 73.  She received a Masters in Business Administration from Phoenix University in Atlanta in 2007, graduating with a 3.27 GPA.  Id. Attached as Exhibit 3 are letters to the Court from two of Ms. Elliott's class mates while at the University of Phoenix, Kassondra Riley and Charlene Swift.  In her letter, Ms. Riley specifically addresses Ms. Elliott's acceptance of responsibility, noting that when discussing the charges and her conviction, Ms. Elliott "could not have been more remorseful and humble."

D.    Employment

From 2003 to 2005, and while attending college, Ms. Elliott also  worked for the Army Corp of Engineers in Chatsworth, Georgia.  She received a medal for her exemplary service as an administrative support assistant.  PSR ¶ 79.  In March 2005 Ms. Elliott formed her own company, Tech Group Investments, organizing bids, bonds, change orders and conducted estimation and contract administration for various companies.  PSR ¶ 78.  From May of 2007 to May of 2012, Ms. Elliott worked for the Georgia Department of Defense as an engineer operations manager and an assistant director of maintenance and engineering. PSR ¶ 77.  Attached as

Exhibit 4 are letters from Jermicka Vauss Stinson, a co-worker, and LTC B. David Hunter, Ms. Elliott's direct supervisor at the Georgia Department of Defense. In his letter, LTC Hunter notes that during her tenure at the Georgia Department of Defense, Ms. Elliott was a hard worker, working on weekends and countless hours of over time. He notes that while working for him, Ms. Elliott performed "exceptionally," taking pride in her duties. When LTC Hunter had a heart attack in 2011, Ms. Elliott had daily conference calls with her boss to ensure completion of projects and also visited him in the hospital every day. When LTC Hunter wanted to form a charitable organization, Military Street Soldierz, Ms. Elliott volunteered her time to help him set up the organization. LTC Hunter concludes his letter by stating that if he was in a position to hire civilians, he "would, without a doubt, hire her again."

    E.    <u>Volunteer Work</u>

Ever since she was a teenager, Ms. Elliott has volunteered to help others. Her high school ROTC instructor, Maj. Morley, noted in his letter how Ms. Elliott volunteered at Heritage Hall, an assisted living facility. Exh. 1. Attached as Exhibit 5 are letters from members of the community that are familiar with Ms. Elliott's volunteer work. One of the letters is from Alan Hughes. Mr. Hughes describes how Ms. Elliott volunteered with Habitat for Humanity, helping build a house for a family. Ms. Elliott has also volunteered every year, since 2008, with Hosea Feed the Hungry,

helping serve meals to families and individuals living in poverty or near poverty levels.  Mr. Hughes also references work done by Ms. Elliott to help establish the Military Street Soldiers charity and how she volunteers at the "Back to School Picnic" event held every year.

Councilman Tracey Wyatt, of the City of College Park, has written a letter outlining Ms. Elliott's volunteer activities for the last five years.  Ms. Elliott has volunteered her time to help out with the City of College Park recreation center, diagnosing computer issues, restoring access to the computer lab and training the young to help them improve their technical skills.  While Councilman Wyatt notes that he does not condone Ms. Elliott's criminal actions, he is compelled to speak on her behalf regarding her positive attributes.  In his opinion, Ms. Elliott's "community activism is her strongest character feature."

Every year Ms. Elliott has participated in voter registration drives.  Even though she herself has lost her right to vote, she continues to volunteer.  Just this past Saturday she volunteered at the Manchester Oak Apartments located off Godby Rd. in College Park with Councilman's Wyatt's campaign to register people to vote.  She advised others of her criminal conviction and emphasized the importance of the right to vote and the opportunity to have a voice in our political system.

Included is also a letter from Tanisha Brown, outlining Ms. Elliott's volunteer

work with SistasAtlanta.  As a volunteer with this organization, Ms. Elliott helps other African American women with resume writing, developing business plans and helping them incorporate their own businesses.

Not only has Ms. Elliott donated her time and skills to organizations in the community, she has also served as a mentor to others.  Included in Exhibit 5 is a letter from Dr. Benjamin Renelus.  Dr. Renelus met Ms. Elliott while he was in medical school and needed a place to live.  Ms. Elliott rented a basement apartment to Dr. Renelus at a deeply discounted rate, so Dr. Renelus could afford a place to live.  Here is a photo of Dr. Renelus at his graduation, standing with Ms. Elliott.



Dr. Renelus notes in his letter that Ms. Elliott was like an older sister, who helped him and advised him as to his personal life and professional career.

Also attached as part of Exhibit 5 is a letter from Sandy Smith.  Ms. Smith is

Ms. Elliott's cousin.  In her letter, Ms. Smith discusses how Ms. Elliott counseled and mentored her children.  Ms. Elliott guided Courtney, the youngest son, thru high school and into a military career.  An older  son, Lance, recently moved to Atlanta. Ms. Elliott helped him by finding him a place to stay, feeding him, taking him to different job interviews and helping him secure a job.

Ms. Elliott has continued to volunteer, despite her criminal charges.  Also part of Exhibit 5 is a letter from Tyrus Tuck, Program Director / Executive Officer of Tuck Counseling Services. Since 2008,  Ms. Elliott has donated her time and services to be a volunteer mentor with this organization.  Ms. Elliott has worked with the African American Women's Outreach section, to help African American women and youth to increase their interest and confidence in technology.  Ms. Elliott has also volunteered in programs related to addiction, risk reduction and prevention.  Just this year, Ms. Elliott has been volunteering 16 hours per month with the organization.  At the time Mr. Tuck wrote his letter in July of 2015, Ms. Elliott had volunteered 80 hours with the organization for calendar year 2015.

F.    Additional letters

Attached as Exhibit 6 are additional letters from members of the community that know Ms. Elliott.  Exhibit 6 includes letters from the following persons: Wilfred L. Flowers, Tanaya D. Tuck, attorney Yusef Poole, Theresa Laury, William H. Ayres,

Jr., Chevonne Ayres, Pastor Paul M. Wilson, Kenneth W.Duker, Ta'Nesha Austin, and Rev. Dr. Raymond Q. Lawing.  The letters  reference Ms. Elliott's exemplary military service, her years of commitment to the community by doing volunteer work, her acceptance of responsibility for her actions and  her remorse.

Attached as Exhibit 7 are letters from Ms. Elliott's family.  The exhibit includes a letter from her mother, Mary P. Elliott, a letter from her former sister-in-law, Joyce L. Woodson , her cousin,  Earlene Neighbors and her oldest brother,  AH. Even though Ms. Elliott does not have any children of her own, the family letters address how Ms. Elliott has also been a mentor to her niece and nephew.  Mary Elliott's letter sums up the family's reaction to Ms. Elliott's charges.  The family understands the severity of the charges and is "heartbroken."  At the same time, the family hopes the Court will consider Ms. Elliott's history of good deeds in deciding the appropriate sentence in her case.

## GUIDELINE CALCULATION

The parties' loss calculation in this case differs from the probation officer's loss calculation in the PSR.  For this reason, counsel will briefly address the issue in this section.  This relates to the loss calculations in paragraphs 29 and 35 of Ms. Elliott's PSR.

Both the Government and the Defense agree that Ms. Elliott is responsible for

the fraud involving Lakeisha Ellis' company, Total Source Solutions. The loss relating to Ms. Ellis' company amounts to $74,902. This results in an 8 level increase of the guidelines under U.S.S.G. § 2B1.1(b)(1)(E).

The Government and the Defense do not agree as to the loss regarding Angela Thicklin's company, 3M Construction. At the time of Ms. Elliot's plea, the government reserved the right to argue that Ms. Elliott could be held responsible for up to $41,000 of loss relating to 3M Construction. Ms. Elliott does not agree with this figure. However, even if this Court adopted the Government's position, Ms. Elliott would still be facing an 8 level increase under U.S.S.G. § 2B1.1(b)(1)(B) because the loss is under $120,000 ($74,902 for TTS + $41,000 for 3M = $115,902).

The probation officer is taking the position that the loss relating to 3M Construction is $78,640, a figure higher than the numbers contemplated by the parties in the plea agreement. Both the government and the defense have objected to this finding in the PSR. At sentencing, Ms. Elliott will ask the Court to rule on this issue.

## ARGUMENT AND CITATION TO AUTHORITY

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Koon v. United States, 518 U.S. 81, 113

11

(1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." <u>Williams v. New York</u>, 337 U.S. 241, 247 (1949). Congress itself has imported this principal into 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct," and in 18 U.S.C. § 3553(a)(1), which requires a court to consider "the history and characteristics of a defendant."

The Supreme Court reaffirmed a sentencing court's freedom, indeed its obligation, to consider the entire universe of facts in a defendant's life: "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" <u>Pepper v. United States</u>, 131 S. Ct. 1229, 1239-40 (2011) (citations omitted). This is not a new development, it has simply been revived since <u>United States v. Booker</u>. More than sixty years ago, the Supreme Court noted that

> The knowledge of the life of a man, his background and his family, is the only proper basis for the determination as to his treatment. There is no substitute for information. The sentencing judge in the Federal court has the tools with which to acquire that information. Failure to make full use of those tools cannot be justified.

<u>Williams</u>, 337 U.S. at 249 n.14 (citation omitted).

12

A district court must impose a sentence that is "sufficient but not greater than necessary" to meet the goals of the Sentencing Reform Act.  18 U.S.C. § 3553(a).[1]

The sentencing guidelines and its commentary are merely two of many factors a court must consider in crafting a reasonable sentence.  18 U.S.C. § 3553(a)(4), (5).  "[T]he Guidelines should be the starting point and the initial benchmark.  The Guidelines are not the only consideration, however."  Gall v. United States, 552 U.S. 38, 49 (2007).

In a particular case, the reasonable sentence may vary sharply from the advisory guideline range.  The Supreme Court has often approved of below-guideline sentences.  See Gall, supra (approving probationary sentence where the guideline range was 30-37 months imprisonment); Kimbrough v. United States, 552 U.S. 85, 109 (2007) (a district court may reasonably impose a below-guideline sentence based

---

[1] 18 U.S.C.A. § 3553(a) requires courts to consider the following factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed — (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing guideline range; (5) any pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

on the notorious crack-powder cocaine disparity); <u>Nelson v. United States</u>, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis in original).  The Eleventh Circuit has also held that a sentence within the guideline range can produce an unreasonable result.  *See, e.g., <u>United States v. Hunt</u>*, 459 F.3d 1180, 1184(11th Cir. 2006).  ("There are, however, many instances where the guideline range will not yield a reasonable sentence").  In Ms. Elliott's case, like any other, the guideline range is an important factor, but it cannot be determinative.  Following is a discussion of several factors that merit a downward variance in Ms. Elliott's case.

A.   <u>Ms. Elliott's Military Service</u>

As noted in the letters attached as Exhibits 2, Ms. Elliott honorably served her country in the United States and abroad.  The guidelines recognize military service as relevant and as a factor that can be considered by the Court in deciding whether a downward departure is appropriate.  U.S.S.G. § 5H1.11.  <u>See</u> also <u>Kimbrough v. United States</u>, 128 S.Ct. 558 at  575, affirming a district court's below guidelines sentence based in part on the defendant's military service.

B.   <u>Ms. Elliott's History and Characteristics</u>

The letters submitted by family and friends show that Ms. Elliott is a self made, hard working woman who has dedicated a significant portion of her time to

volunteering and helping others.  Exhibit 5 contains letters from members of the community familiar with her volunteer work.  She has volunteered with well-known organizations, such as Habitat for Humanity and Hosea Feed the Homeless.  She devotes 16 hours a month volunteering with an African American Women's Outreach group.  Her volunteering dates back to high school, and is not something she has done to curry favor with the Court.  She has always been committed to helping others, and this is reflected in the length of her community service history.

Courts have recognized that a defendant's volunteer work can be considered as part of a defendant's characteristics in arriving at a reasonable sentence in a particular case.  Just this year, the Eleventh Circuit affirmed a downward variance in a case based on a defendant's history of good deeds.  United States v. Rouhani, 598 Fed.Appx. 626, 631 (11th Cir. 2015).  Similarly, in United States v. Canova, 412 F.3d 331, 358-359 (2nd Cir. 2004), the Second Circuit Court of Appeals noted that it was not unreasonable to consider a defendant's extraordinary public service and good works in granting a downward departure.

C.   Voluntary Termination of the Offense

This Court will be sentencing Ms. Elliott for conduct that occurred five years ago.  The conduct involving the GA DOD started in 2008 and ended in 2010.  PSR § 20.  The conduct involving Baumeller-Nuermont Corporation lasted only 4 months

15

during the summer of 2010.  Thus, the conduct for both crimes stopped in 2010, long before discovery and long before the investigation began.  As the Supreme Court has recognized, a court can consider a person's withdrawal from crime as a factor in determining a reasonable sentence.  Gall v. United States, 128 S.Ct. 586, 600-601 (2007).  In Gall, the defendant was facing a guideline range of 30 to 37 months.  Gall, 128 S.Ct. at 593.  The Supreme Court affirmed the district court 's imposition of a probationary sentence.  Id. at 602.  This variance was in part due to the defendant's withdrawal from the conspiracy years earlier.  Id.

     D.    Collateral Consequences of a Conviction

The letters presented to the Court reference some of the consequences Ms. Elliott has already suffered as a result of her criminal conduct.  As her immediate supervisor notes in his letter, the conduct not only led to termination from the Georgia Department of Defense for Ms. Elliot, but also resulted in debarment from Clay National Guard Center and debarment from State of GA Department of Administrative Services.  Exh. 4, letter of LTC Hunter.  Shortly before her arrest, Ms. Elliott had started working for the City of Richmond.  PSR §76. Ms. Elliott lost her job after she turned herself in on this federal indictment.  Id. As a result of her acts, Ms. Elliott will not be able to be licensed in her profession.  Exh. 6, letter of Mr. Flowers.

Courts consider the collateral consequences of a conviction in arriving at a reasonable sentence.  Here are some examples: <u>United States v. Redemann</u>, 295 F.Supp.2d 887, 896-897 (E.D. Wis. 2003)(Downward variance warranted where defendant civilly prosecuted for fraud, subjected to adverse publicity in his small town and debarment from future involvement with federally regulated financial institutions); <u>United States v. Ranum</u>, 353 F.Supp.2d 984, 991 (E.D. Wis. 2005)(Fact that defendant lost his new job as a result of conviction and will never be able to work in banking again justified downward departure).  As noted above, Ms. Elliott's criminal conduct has affected her livelihood.  This is another factor the Court should consider in arriving at a reasonable sentence in her case.

E.   <u>The Guideline Sentence Substantially Overstates the Seriousness of the Offense</u>

PSR § 33 notes that Ms. Elliott starts at a base offense level of 14.  This is because under U.S.S.G. § 2C1.1 she is a "public official."  Legally, Ms. Elliott meets the definition of a public official, as an employee of any department, agency or branch of government.  U.S.S.G. § 2C1.1, App. N. 1.  Ms. Elliott, however, was not an elected official.  Neither was she able to expend funds.  Her case should be compared with that of Keith Glenn, a United States Property and Fiscal Office employee for the Georgia Army National Guard, similarly situated to Ms. Elliott,

17

who was also prosecuted in this district. United States v. Glenn, 1:13-CR-224-WSD.

Mr. Glenn was allowed to plea to a violation of 18 U.S.C. § 201(c)(1)(B), for

accepting a bribe in his capacity as a public official. This statute calls for the

application of guideline § 2C1.2, as opposed to § 2C1.1, which is the guideline

applied to Ms. Elliott. While Ms. Elliott started as a public official at a level 14, Mr.

Glenn started as a public official at a level 11. This resulted in a significant benefit

to Mr. Glenn, a 3 level guideline difference. The defense submit that this Court

should consider similarly situated individuals in deciding what a reasonable sentence

is in this case.

      E.    Application of New Sentencing Guidelines

The loss table set out in U.S.S.G. § 2B1.1 is set to change on November 1,

2015, less than 2 months for now. The new loss table is attached for the Court's

convenience as Exhibit 8. Some of the district court judges in the Northern District

of Georgia have applied the new loss table to pending cases, whether by directly

applying the new loss table or downwardly varying in order to apply the new loss

table. See e.g. United States v. Greene, 1:14-CR-350-TCB and United States v.

Cantrell, 1:15-CR-67-SCJ. Both Judge Batten and Judge Jones have granted

downward variances to account for the new amended guidelines.

Depending on how this Court rules regarding the loss amount, Ms. Elliott may

or may not benefit from the new guidelines.  In the event Ms. Elliott could benefit from the new guidelines, the defense will ask this Court to be pragmatic and apply the new guidelines out of basic fairness to Ms. Elliott.

F.    Request for Downward Variance

The Defense requests that pursuant to the 18 U.S.C. § 3553(a) factors, this Court downwardly vary from the applicable guideline range.  In some of the letters submitted to the Court, friends and colleagues of Ms. Elliott are requesting a probationary sentence.

A below guideline sentence will address the §3553 factors.  While Ms. Elliott has been convicted of a serious crime, she voluntarily withdrew from the criminal conduct years before her prosecution and has accepted responsibility for her actions. Her personal characteristics are discussed above at length, and merit consideration by this Court.  Her criminal conviction has already sent a strong message to Ms. Elliott, serving as deterrence.  The collateral consequences of the conviction, such as her inability to work in her field, while self inflicted, are nevertheless a form of punishment.

Before the instant offense, Ms. Elliott lived her entire life respectfully following the law. She served her country honorably and has devoted countless hours to helping others.  A below guidelines sentence can serve as deterrent, not only to Ms.

19

Elliott but to others.  Additionally, a below sentence guideline is  sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public. See e.g. United States v. Carey, 368 F.Supp. 2d 891, 895 (E.D. Wis. 2005).  For all the reasons above, the Defense respectfully requests a downward variance in Ms. Elliott's case.

Respectfully submitted this the 8th day of September, 2015.

Respectfully submitted,

*/s/ Vionnette Johnson*
Vionnette Reyes Johnson
Attorney for Defendant Elliott
Georgia State Bar No. 601290

Federal Defender Program, Inc.
101 Marietta Street, N.W., Suite 1500
Atlanta, Georgia 30303
(404) 688-7530   Fax (404) 688-0768
Vionnette_Johnson@FD.Org

CERTIFICATE OF SERVICE

I hereby certify that the foregoing Sentencing Memorandum was formatted in Times New Roman 14 pt., in accordance with Local Rule 5.1C, and was electronically filed this day with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to Assistant United States Attorney of record Stephen McClain, 600 Richard B. Russell Building, 75 Ted Turner Drive, S.W., Atlanta, Georgia, 30303.

Dated: This the 8th day of September, 2015.

*/s/ Vionnette Johnson*
Vionnette Reyes Johnson